## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES MARKEL
c/o Covington & Burling LLP
850 10th Street NW
Washington, DC 20001

                          Plaintiff,

    v.

CARLOS DEL TORO, SECRETARY OF
THE NAVY, UNITED STATES OF
AMERICA, in his official capacity,
1000 Navy Pentagon
Washington, DC 20350,

UNITED STATES DEPARTMENT OF
THE NAVY
1000 Navy Pentagon
Washington, DC 20350, and

BOARD FOR CORRECTION OF
NAVAL RECORDS
701 S. Courthouse Road
Building 12, Suite 1001
Arlington, VA 22204

                          Defendants.

Civil Action No. 22-1389

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## I.      **INTRODUCTION**

1.    Plaintiff James Markel, a veteran of the United States Navy ("Navy" or "the Navy"), brings this action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq* ("APA"), for judicial review of a decision by the Board for Correction of Naval Records ("BCNR" or "Board") based on the Board's failure to give meaningful consideration to Mr. Markel's inability to perform the duties of his office, grade, rank, or rating as a result of a mental health condition that he incurred while entitled to basic pay.

2.      Mr. Markel initially served as a commissioned Surface Warfare Officer trainee in the submarine and nuclear field, deployed aboard the USS Forrest Sherman.  The primary duty of all Surface Warfare Officer trainees is to qualify as a Surface Warfare Officer.  Since the ultimate goal of every Surface Warfare Officer is command at sea, each trainee, in order to qualify, must complete nine months at sea.  But after nearly two months at sea, Mr. Markel was removed from the USS Forrest Sherman and assigned to Limited Duty precisely because he could no longer reasonably perform the duties of his office, grade, rank or rating due to his Major Depressive Disorder.

3.      In denying Mr. Markel's request for a correction of his records to reflect a medical retirement, the Board failed to consider Mr. Markel's actual duties and instead relied on an evaluation of Mr. Markel's performance of administrative tasks while he was assigned to Limited Duty.  The Board's failure to evaluate whether Mr. Markel was fit to perform his actual duties as a Surface Warfare Officer trainee was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence.  Moreover, the Board's error deprived Mr. Markel of the stature and benefits that flow from designation as a military retiree.  Mr. Markel seeks, among other relief, an order under 5 U.S.C. § 706 setting aside the Board's denial and compelling the Secretary of the Navy to classify his separation from the Navy as a medical retirement, with all incumbent rights, privileges, and associations.

## II.      JURISDICTION AND VENUE

4.      Plaintiff brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*. ("APA").

5.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA.  10 U.S.C. §§ 1201(b), 1203(b); 5 U.S.C. §§ 701–706.

6.      Plaintiff seeks exclusively declaratory and other equitable relief.  *See* 5 U.S.C. § 702.  Plaintiff seeks a declaration that the BCNR's denial of Plaintiff's application was arbitrary, capricious, unsupported by substantial evidence, and contrary to law, and an order compelling the Secretary of the Navy to classify Plaintiff's separation from the Navy as medical retirement.

7.       The BCNR's denial of Plaintiff's application was a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

8.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Navy is an officer of the United States and because a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia.  Venue is also proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

9.      In accordance with 28 U.S.C. § 2401, this action is brought within six years of the BCNR's decision.

### III.    PARTIES

10.     Plaintiff James Markel is a veteran of the United States Navy who entered the Navy after graduating from the Naval Academy in May 2006.  Mr. Markel was administratively separated and honorably discharged from the United States Navy on March 1, 2009, as a Lieutenant, Junior Grade, at a Pay Grade of O-2.  Mr. Markel is a United States citizen and resides in Glen Rock, Pennsylvania.

11.     Defendant Carlos Del Toro is the Secretary of the United States Navy, and is named solely in his official capacity.  He is the chief officer of the United States Navy, and exercises

authority, direction and control over the United States Navy.  Defendant Del Toro is authorized by

10 U.S.C. § 1552 to correct the military record of any former member of the United States Navy

when he considers it necessary to correct an error or remove an injustice.  Upon information and

belief, Defendant Del Toro performs a significant amount of his judicial duties within this district.

12.     Defendant United States Department of the Navy is an agency of the United States

government.

13.     Defendant Board for Correction of Naval Records ("BCNR" or "the Board") is an

agency of the United States Department of the Navy, located in Arlington, Virginia.  The BCNR

is the board of civilians established by the Secretary of the Navy which, pursuant to 10 U.S.C.

§ 1552, considers applications filed before it for the purposes of determining whether an

applicant's Navy military record should be changed to correct an error or injustice.

## IV.     FACTUAL ALLEGATIONS

### A.     Military Disability and Retirement Generally

14.     Title 10, U.S.C., chapter 61, establishes the military's Disability Evaluation System

("DES"), and provides the Secretaries of the Military Departments with authority to retire or

separate service members who are unable to perform their military duties because of physical

disability resulting from either illness or injury.  When a member of the U.S. Armed Forces has

one or more disabilities that make the member unfit for continued military service, he is normally

separated from service with either (1) medical separation, or (2) medical retirement.  This

determination turns on the combined disability rating assigned by the military department to the

conditions that render the service member unfit for continued service.

15.     If a military department assigns the service member a combined disability rating of

30% or more, the service member is medically retired.  A medical retiree is entitled to, among

other things, military health care (TRICARE) for the retiree and the retiree's spouse and minor

children, as well as access to military bases, commissary privileges, the right to wear the uniform on appropriate public occasions, space-available travel on military aircraft, disability retirement pay, military funeral arrangements, and burial privileges in national cemeteries.

16.     Importantly, the determination as to whether a service member is unable to perform their duties because of a disability focuses on the duties of that service member's office, grade, rank, or rating.  *See* 10 U.S.C. § 1201 (allowing the Secretaries of the military branches to grant medical retirements when a service member is "unfit to perform the duties of the member's office, grade, rank, or rating").

17.     The term "office" means a "position of duty, trust, authority to which an individual is appointed."  Department of Defense Instruction ("DoDI") 1332.38 § E2.1.21.1.[1]  The term "grade" means step or degree, in a graduated scale of office or military rank, that is established and designated as a grade by law or regulation.  10 U.S.C. § 101(b)(7).  The term "rank" means the order of precedence among members of the armed forces.  10 U.S.C. § 101(b)(8).  The term "rating" reflects an individual service member's occupational field.  10 U.S.C. § 101(b)(9) ("The term 'rating' means the name (such as 'boatswain's mate') prescribed for members of an armed force in an occupational field."); DoDI 1332.38 § E2.1.21.4.[2]  Additionally, the Navy uses "designator" codes to classify, identify, and document occupational field duties and qualifications. *See Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-6.

**B.     DES Process**

18.     The DES is initiated by referral and consists of several phases of evaluation and review that result in a final disability determination for a referred individual.  In the Navy, the DES

---

[1] The term "officer" means a commissioned or warrant officer.  *See* 10 U.S.C. § 101(b)(1).

[2] The term "rate" means the name (such as "chief boatswain's name") for members in the same rating or other category who are in the same grade.  10 U.S.C. § 101(b)(9).

process begins when a commanding officer refers a service member for medical evaluation.  *See* Secretary of the Navy Instruction ("SECNAVINST") 1850.4E §§ 3102, 3106.[3]

19.     If a wound, illness, or injury results in a permanent condition or has long-lasting effects, a service member is then formally referred to the DES by an attending physician.

20.     After referral, the first formal phase of the DES process involves review by a Medical Evaluation Board ("MEB") of the service member's medical status and duty limitations.  *See* DoDI 1332.38 § E3.P1.2.1.  The MEB is charged with determining whether any of a service member's mental or physical conditions fail the retention standards set forth by the service member's particular military branch, and the specific reasons why the service member does not meet retention standards.  *See* DoDI 1332.38 §§ E4.A1.1.2.11.1–2.

21.     The MEB does not state a conclusion of unfitness due to physical disability, or assign a disability percentage rating, but instead documents a medical opinion that informs the next phase of the DES process to the extent that it proceeds.  *See* SECNAVINST 1850.4E § 3104(a).

22.     If the MEB determines that none of the service member's conditions fail the retention standards, the member is returned to full duty.  But if the MEB determines that one or more of the service member's medical conditions fail the retention standards, the member is referred to a Physical Evaluation Board ("PEB") within DES.  *See* DoDI 1332.38 § E4.A1.1.2.11.4.

23.     The PEB process is responsible for determining a service member's unfitness for duty as a result of disability.  DoDI 1332.38 § E3.P1.3.1.  The PEB process can include a review

---

[3] SECNAVINST 1850.4E was operative at all relevant times of this Complaint.  It governed the Navy DES, and was promulgated under authority granted by 10 U.S.C. § 1216(a)–(b) and DoDI 1332.38.

by an informal board, a formal board, and appellate review, which in the Navy is conducted by the Naval Council of Review Boards (formerly known as the Naval Council of Personnel Boards) for service members who have not yet been discharged or separated, and by the BCNR for service members who have been separated or retired.  *See* SECNAVINST 1850.4E § 5001.

24.    A service member "shall be considered unfit when the evidence establishes that the member . . . is unable to reasonably perform the duties of his or her office, grade, rank, or rating ([also] called duties)[.]" DoDI 1332.38 § E3.P3.2.1; SECNAVINST 1850.4E § 3302(a).   To determine whether a service member is unable to reasonably perform his duties, the PEB may consider the following general criteria, including whether the service member (1) has a medical condition that represents a decided medical risk to himself or to the welfare of other members, or (2) the medical condition imposes unreasonable requirements on the military to maintain or protect the member.  DoDI 1332.38 § E3.P3.2.2; *see also* SECNAVINST 1850.4E § 3302(b)(1)–(2).

25.    Per DoDI 1332.38, determining whether a service member can reasonably perform his duties includes four relevant considerations, the first of which is whether the service member can reasonably perform the "common military tasks" of his office, grade, rank, or rating.  DoDI 1332.38 § E3.P3.4.1.1; *see also* SECNAVINST 1850.4E § 3304(a)(1).  These tasks depend on the occupation of the service member; for example, if a service member is routinely required to fire his weapon, perform field duty, or wear load bearing equipment/protective gear, the determination for this particular service member would look at whether he could reasonably perform those tasks. *Id.*

26.    The three other available considerations to determine whether a service member can reasonably perform his duties include: whether the service member can take and pass the required physical fitness test; whether the service member is deployable (if the service member's

office, grade, rank, or rating requires deployability); and whether the service member's condition causes loss of qualification for specialized duties.  DoDI 1332.38 §§ E3.P.3.1.2–4; *see also* SECNAVINST 1850.4E § 3304(a)(2)–(4).

27.    The PEB's analysis is constrained to whether a service member can reasonably perform the duties as assigned prior to referral into the DES process.  The regulations do not grant the PEB authority to make a fitness determination based on whether a service member can reasonably perform duties that are *outside* his or her office, grade, rank, or rating.

28.    The PEB process has four possible outcomes.  In particular, a service member can be found:

    a.  ***fit for duty***;

    b.  ***unfit for duty, but ineligible for disability benefits*** because, among other reasons, the disability condition was not incurred in the line of duty, existed prior to service, was the result of intentional misconduct or willful neglect, or was incurred during an authorized absence;

    c.  ***unfit for duty and eligible for medical retirement*** with monthly disability retirement pay and other benefits; or

    d.  ***unfit for duty and eligible for medical separation*** with one lump-sum severance payment.[4]

29.    If a service member is found unfit and eligible for either a medical retirement or medical separation, the PEB must assign a percentage disability rating for each unfitting condition, and must use the Veterans Affairs Schedule for Rating Disabilities in doing so.  *See* 10 U.S.C. §§ 1201, 1203, National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1642(a), 122 Stat 465, codified at 10 U.S.C. § 1216a.

---

[4] Service members who receive a disability rating of less than 30% are not eligible for medical retirement and may instead be eligible for medical separation.  *See, e.g.*, 10 U.S.C. §§ 1201, 1203.

C.     **Mr. Markel's Military History**

30.     Plaintiff James Markel entered the US Naval Academy in Fall 2002.  He had the option to attend the University of Virginia, but after the September 11th attacks, he decided that he wanted to volunteer to defend his country and chose to go to the Naval Academy.

31.     At the Naval Academy, Mr. Markel excelled academically.  He majored in economics with a minor in German, and graduated in May 2006 with distinction near the top of his class.  Mr. Markel was then commissioned as an Officer in the Navy as an Ensign, and joined with the designator "1160," which is for an Unrestricted Line Officer who is in training for Surface Warfare qualification.[5]  The Navy describes Surface Warfare Officers as "involved in virtually every aspect of Navy missions," with responsibility over "any number of shipboard operations and activities while at sea," including the provision and coordination of defense for aircraft carriers, the provision of attack and defensive measures for surface warfare support, and other logistical support.[6]

32.     Mr. Markel also received a nuclear Additional Qualification Designator, which qualified him for duty involving the supervision, operation, and maintenance of naval nuclear propulsion plants.

33.     After graduating and receiving designator 1160, Mr. Markel continued his studies for one year, studying abroad in Germany.  In August 2007, Mr. Markel returned from his studies

---

[5] *Manual of Navy Officer Manpower and Personnel Classifications* (Jan. 2010), Vol. I at A-7 (1160 is an "Unrestricted Line Officer billet for an officer in training for Surface Warfare qualification."). The Surface Warfare Officer designator can be for conventional ships or nuclear-powered ones.  *See* OPNAV Instruction 1420.1B (Dec. 2009), Encl. 1, Ch. 4 § 4.  Once the trainee qualifies, his or her designation is changed from 116X to 111X.  *See Navy Personnel Manual* ("MILPERSMAN") 1210-090 (Sept. 2006), § 1(b).

[6] United States Navy Recruiting, *Surface Warfare Officer*, https://www.navy.com/careers/surface-warfare-officer-swo.

and subsequently reported for duty aboard the USS Forrest Sherman (an *Arleigh Burke*-class guided missile destroyer) in order to begin to qualify as a Surface Warfare Officer.

34.     Surface Warfare Officer qualification "is the direct responsibility of every [service member designated] 116X . . . and is the initial milestone in training and qualification process that culminates in command at sea." OPNAV Instruction 1412.2H (May 2002) § 3.  Officers pursuing qualification must, among other things, be assigned permanent duty on a commissioned U.S. Navy Surface ship for a minimum of 9 months within their first 18 months of shipboard service, *id.* at §§ 5(b), 6, and qualify and serve as "In Port Officer of the Deck,"  "Combat Information Center Watch Officer" and "Underway Officer of the Deck."  *Id.* at § 5(c), (e)–(g).

35.     On board the USS Forrest Sherman, Mr. Markel began his Surface Warfare Officer qualification process while serving as an Assistant Communications Officer.  Mr. Markel's duties included actively managing personnel and obtaining highly technical qualifications, and he helped oversee and manage 13 Information System Technicians that were responsible for administering and maintaining the ship's radio and computer equipment, including satellite communications and cryptographic equipment.  In addition to these supervisory responsibilities, Mr. Markel was also required to stand five-hour watches, requiring alertness, every ten hours.

36.     In November 2007, while serving on the USS Forrest Sherman, Mr. Markel experienced anxiety, difficulty breathing, rapid heartbeat, restlessness, inability to sleep, trouble focusing, and feelings of frustration and agitation.  At times, he also had thoughts of self-harm and/or harming others.   Mr. Markel's symptoms eventually became so intense that his commanding officer ordered Mr. Markel to be medically evacuated off the USS Forrest Sherman to a U.S. Naval hospital in Rota, Spain for evaluation and inpatient treatment.

37.     At the hospital, Mr. Markel was prescribed medication and diagnosed with Bipolar Disorder.  During this time, Mr. Markel reported auditory hallucinations.  After being evaluated in Spain for ten days, Mr. Markel was discharged to the Naval Medical Center in Portsmouth, Virginia for further treatment and care.  At the same time, Mr. Markel was reassigned from his shipboard duties to working in an administrative role under the Commander of the Naval Surface Force for the U.S. Atlantic Fleet ("SURFLANT") in December 2007.

38.     Also at this time, while at Portsmouth, Mr. Markel's doctors determined that he was not "psychiatrically fit for full duty" and therefore was placed on Limited Duty and referred to an MEB for evaluation.  Mr. Markel's office, grade, rank, and rating did not change.

39.     While on Limited Duty at SURFLANT, Mr. Markel performed administrative tasks, such as data entry and compiling reports, which did not require any technical skills.  Mr. Markel was free to attend therapy and medical appointments during the workday and worked limited hours.  Unlike his role on the USS Forrest Sherman, Mr. Markel's role at SURFLANT did not require him to serve on a surface warfare ship, to stand watch, to qualify as an "In Port Officer of the Deck," "Combat Information Center Watch Officer" or "Underway Officer of the Deck, or to even supervise any other sailor.  Mr. Markel also took prescribed medications during this time that limited his ability to perform complicated tasks.  Mr. Markel's assigned tasks at SURFLANT were in stark contrast to those he performed while serving aboard the USS Forrest Sherman as an Unrestricted Line Officer who is in training for Surface Warfare qualification.

40.     On January 31, 2008, the MEB changed Mr. Markel's diagnosis from Bipolar Disorder to Major Depressive Disorder, Recurrent, with Psychotic Features.  The MEB also determined that Mr. Markel suffered "from a condition that did not exist prior to entry into the service," and that he had "received the maximum benefit of military medical treatment [which]

has not restored the patient to a duty status."  Accordingly, the MEB referred Mr. Markel's case to a PEB.

41.    On March 10, 2008, while on Limited Duty and still experiencing symptoms, the PEB found that Mr. Markel was fit to continue active duty.  The PEB's written decision did not explain the basis for its finding.

42.    Despite the PEB's fitness finding, in June 2008, the Navy's Bureau of Medicine and Surgery ("BUMED") notified Mr. Markel that he no longer met the standards for Submarine and Nuclear Field Duty because of "a history of Bipolar and Anxiety Disorder; Recurrent Depression, current Psychotropic [medication] use[.]"  Further, BUMED did not recommend a waiver of these standards for Mr. Markel. As a result of this limitation and BUMED's determination that Mr. Markel did not meet the established physical standards for his field, Navy Personnel Command medically disqualified Mr. Markel from Submarine and Nuclear Field Duty. The medical disqualification removed Mr. Markel's nuclear Additional Qualification Designator and terminated his eligibility for Nuclear Officer Incentive Pay.

43.    In July 2008, Mr. Markel was also found to be "assignment limited" (meaning he could not be deployed worldwide without limitations) and found not suitable to return to sea duty based on his current mental state.  Since Mr. Markel's mental health condition precluded his return to sea duty, and his primary duty as a Surface Warfare Officer trainee was to remain aboard a surface warfare ship for at least nine months and to qualify for various jobs on board, he had no pathway to qualification as a Surface Warfare Officer.

44.    Despite his disqualification from sea duty, Mr. Markel knew that he could still strongly contribute to the Navy, so he sought a redesignation into Human Resources.  Recognizing Mr. Markel's talents in a non-shipboard environment, SURFLANT Commander Captain Berdar

wrote a letter in support, "strongly recommend[ing]" Mr. Markel for redesignation. Captain Berdar described Mr. Markel as an "exceptional junior officer," an "indispensable asset," and possessing "uncanny organizational, leadership, and deductive reasoning skills." Captain Berdar also completed a fitness report for Mr. Markel in which he noted that Mr. Markel's performance was above standards in all respects, with an "unparalleled work ethic."

45.    Captain Berdar's views of Mr. Markel, expressed in his recommendation letter and Mr. Markel's fitness report, were clearly based on Mr. Markel's performance while on Limited Duty at SURFLANT, *not* on Mr. Markel's abilities to perform the duties of his actual office, grade, rank, or rating. Specifically, Captain Berdar stated that Mr. Markel completed tasks such as "compiling of over 1000 impact reports and the maintaining and updating of 3 separate databases." These are not the tasks expected of Mr. Markel's office, grade, rank, or rating, nor consistent with his previous duties while serving as a Surface Warfare Officer trainee aboard the USS Forrest Sherman.

46.    Despite Captain Berdar's enthusiastic recommendation for Mr. Markel's redesignation as a Human Resources Officer, the request for redesignation was denied in November 2008.

47.    Denied redesignation and still unable to engage in sea duty as a result of his mental health condition, Mr. Markel was unable to serve aboard a ship for the minimum time period as required for trainees seeking Surface Warfare Officer qualification, and was given no other option to continue service. Despite his efforts to remain a sailor and fulfill his commitment to the Navy, on March 1, 2009, approximately 18 months after being assigned to the USS Forrest Sherman and at the expiration of the 18 month period to complete his 9 months aboard a ship, Mr. Markel was administratively separated and honorably discharged from the Navy without a medical retirement,

as a Lieutenant, Junior Grade, at a Pay Grade of O-2.  As of the date of his discharge, Mr. Markel received a 50% disability rating for his Major Depressive Disorder from the VA.[7]  The VA also determined that his disability was service-connected, or in other words, that his condition was "incurred during or aggravated by military service."

48.     Other than Mr. Markel's promotion to Lieutenant, Junior Grade, at a Pay Grade of O-2, his office, grade, rank, or rating did not change from the date he reported to the USS Forrest Sherman for duty to the date of his separation.

### D.     Mr. Markel's Post-Military Life

49.     After his discharge, Mr. Markel tried his best to overcome the challenges of his disability and continue to provide for his wife and family.  In 2011, he received a Master's degree in Foreign Service from Georgetown University, and he also took architecture classes at Virginia Polytechnic Institute and State University ("Virginia Tech").

50.     But Mr. Markel's discharge exacerbated his symptoms, and his condition ultimately made it difficult for Mr. Markel to gain and keep employment.  In the years since his discharge, Mr. Markel struggled greatly, experiencing deep bouts of depression and anxiety, and long periods of unemployment.  He has been hospitalized multiple times, including times when Mr. Markel sought treatment because of persistent suicidal thoughts.

---

[7] The VA initially rated Mr. Markel's disability at 30%, but Mr. Markel appealed and as a result, the VA changed its rating to 50%, effective March 1, 2009, the date of Mr. Markel's discharge. The VA subsequently rated Mr. Markel's disability at 100%, effective January 28, 2015.

### E.      BCNR Appeal

51.      In August 2015, Mr. Markel filed an application with the BCNR to obtain a medical retirement.  As Mr. Markel indicated in his application, the PEB's finding of "fit" was erroneous: at around the same time the PEB found him fit, BUMED found that he was medically disqualified from his field and that he could not be deployed.  He had also lost his nuclear Additional Qualification Designator.

52.      On May 20, 2016, the BCNR denied Mr. Markel's application.  Explaining its decision in a short two-page letter, the BCNR appeared to rely solely on Captain Berdar's positive evaluation of Mr. Markel to conclude that Mr. Markel was "performing exceptionally well despite the existence of [his] condition" and that there was no "evidence of an occupational impairment."

53.      As explained above, Mr. Markel's performance under Captain Berdar was while he was on *Limited Duty*.  During this time, Mr. Markel was performing administrative tasks outside of his office, grade, rank, or rating, specifically, tasks such as compiling reports and completing data entry.  Moreover, the BCNR failed to actually identify the duties of Mr. Markel's office, grade, rank, or rating, or provide any explanation as to whether Mr. Markel could reasonably perform those duties.  Instead, the BCNR simply found that because Mr. Markel could perform *some* lesser duties (regardless of whether they were the duties of his office, grade, rank, or rating that he performed as a Surface Warfare Officer trainee), he was not unfit.

54.      Had the BCNR considered the actual duties of Mr. Markel's office, grade, rank, or rating, the only reasonable conclusion would be that Mr. Markel was unfit, particularly given the Navy itself determined that Mr. Markel was medically disqualified from his field and not deployable.  Nor could he serve at sea, a requirement of his office, grade, rank, or rating.  And given that Mr. Markel's VA disability rating was more than 30%, evaluating Mr. Markel under the

15

proper fitness standard would result in Mr. Markel receiving the medical retirement to which he is entitled.

## V.      CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the APA, 5 U.S.C. § 706(2)(A) –
Arbitrary, Capricious, and Otherwise Not in Accordance With Law)**

55.     Plaintiff realleges and incorporates here Paragraphs 1 through 54.

56.     The BCNR's May 20, 2016 decision letter constitutes final agency action under the APA.  Mr. Markel's unsuccessful application to the BCNR was the last available administrative remedy for review of his separation from the Navy.

57.     The BCNR's denial of Mr. Markel's application is arbitrary, capricious, and otherwise not in accordance with law because, in affirming the PEB's fitness finding, the BCNR relied on an evaluation of Mr. Markel's performance of a limited role while on Limited Duty status, instead of determining whether Mr. Markel could reasonably perform the actual duties of his office, grade, rank, or rating due to his medical condition.

58.     Further, as a Surface Warfare Officer trainee, Mr. Markel was required to qualify as a Surface Warfare Officer, which in turn required him to, amongst other things, be assigned permanent duty on a commissioned Navy Surface ship for a minimum of 9 months.  But because of his medical condition, Mr. Markel was placed on Limited Duty and was found not suitable to return to sea, rendering qualification impossible.  The PEB's fitness finding and the BCNR decision ignore this fact.

59.     As a direct result of Defendants' actions, Mr. Markel has been, and continues to be, deprived of the benefits of the disability retirement to which he is entitled.

## SECOND CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(E) –
### Agency Action Unsupported by Substantial Evidence)

60.     Plaintiff realleges and incorporates here Paragraphs 1 through 59.

61.     The BCNR's denial of Mr. Markel's application is unsupported by substantial evidence.  The BCNR's decision letter provides no legal or factual basis for affirming the PEB's fitness determination.  Nor does it provide any information on the actual duties of Mr. Markel's office, grade, rank, or rating, much less any analysis as to whether Mr. Markel could reasonably perform the actual duties of his office, grade, rank, or rating due to his medical condition.

62.     As a direct result of Defendants' actions, Mr. Markel has been, and continues to be, deprived of the benefits of the disability retirement to which he is entitled.

## VI.     REQUEST FOR RELIEF

63.     WHEREFORE, Plaintiff James Markel respectfully requests that the Court provide the following relief:

    a.   Find that the BCNR's determination was arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence;

    b.   Order Plaintiff's military records—including without limitation his DD Form 214 and his retirement orders—be corrected to reflect a permanent medical retirement;

    c.   Declare that the BCNR has violated the Administrative Procedure Act;

    d.   Award Plaintiff interests, costs, and attorneys' fees; and

    e.   Grant such other and further relief this Court deems just and appropriate.

Respectfully submitted this 19th day of May, 2022

*/s/ Jeffrey Huberman*
Einar Stole (DC Bar No. 474012)*            Esther Leibfarth (DC Bar No. 1016515)
Jeffrey Huberman (DC Bar No. 1531182)       Rochelle Bobroff (DC Bar No. 420892)
Sarah Schuler (DC Bar No. 1671088)*         National Veterans Legal Services Program
COVINGTON & BURLING LLP                     1600 K Street, NW, Suite 500
850 10th Street NW                          Washington, DC 20006-2833
Washington, DC 20001-4956                   Phone: (202) 265-8305, ext. 130
Phone: (202) 662-6000                       esther@nvlsp.org
estole@cov.com                              rochelle@nvlsp.org
jhuberman@cov.com
sschuler@cov.com

*Counsel for Plaintiff*

*\*Pro Hac Vice forthcoming*